In the United States District Court for the District of North Dakota

# *Two Shields et al v. Wilkinson et al*

## Motion Hearing – November 15, 2013

---

## **Plaintiffs' Presentation**

---

Susman Godfrey L.L.P., 1000 Louisiana Street, Suite 5100, Houston Texas 77002

Tel: (713) 653-7814 | Fax: (713) 654-3388 | Email: kmcneil@susmangodfrey.com

Table of Contents
1. Williams transaction and the magnitude of the Bakken reserves
2. The BIA and the individual allottee leases
3. Defendants' systematic scheme to improperly influence the BIA
4. Legal standards applicable for aiding and abetting
5. Other legal standards
2

# The Williams transaction and the magnitude of the Bakken reserves

# Williams paid almost a **billion dollars** in late 2010 to acquire **86,000** mineral interest acres on the Fort Berthold Reservation – approximately **$10,000 per acre**

Williams

**Williams Completes Acquisition in the Core of Bakken Shale**

TULSA, Okla., Dec. 21, 2010 /PRNewswire-FirstCall/ -- Williams (NYSE: WMB) announced today that it has completed a major purchase in North Dakota's Bakken oil play from private owners for $925 million cash. Williams announced the acquisition on Nov. 15.

In the transaction, Williams purchased 100 percent of the interests in Dakota-3 E&P Company LLC. Dakota-3 has approximately 85,800 net acres on the Fort Berthold Indian Reservation in the Williston Basin and 3,300 barrels per day of net oil production from 24 existing we[illegible]

Williams' purchase has an effective date of Oct. 1, sub[illegible] standard closing adjustments. Williams is the new owner of Dakota-3, which will continue its existing con[illegible] arrangement for services with the contract operator and field services provider after closing.

Currently, Dakota-3 has three rigs operating on its [illegible] [illegible]iams expects to double the current level of

Williams.

**Williams Companies Acquisition in the Core of Bakken Shale**

Tulsa, Okla. Dec. 21, 2010 ...Williams announced today that it has completed a major purchase in North Dakota's Bakken oil play from private owners for **$925 million cash.**

*Oil and gas reserves and resource potential disclaimer*

*"Reserves potential" as used in this press release may include "proved," "probable," "possible," and "resource estimations."*

*The SEC requires oil and gas companies, in filings made with the SEC, to disclose proved reserves, which are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible – from a given date forward, from known reservoirs, under existing economic condition, operating methods, and governmental regulations. Beginning with year-end reserves for 2009, the SEC permits the optional disclosure of probable and possible reserves. The SEC defines "probable" reserves as "those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered." The SEC defines "possible" reserves as "those additional reserves that are less certain to be recovered than probable reserves." Williams applies these definitions in estimating probable and possible reserves. Statements of reserves are only estimates and may not correspond to the ultimate quantities of oil and gas recovered. Any reserve estimates provided in this press release that are not specifically designated as being estimates of proved reserves may include estimated reserves not necessarily*

– Complaint ¶ 169



The billion-dollar Williams purchase evolved in three stages
Two Shields Class Individual Leases (42,000 Acres)
Tribal Acreage (42,500 Acres)
Dakota-3 E&P LLP
Williams Companies
Dakota-3 (Subsidiary of Williams Companies)
Purchase of two types of leases
Consolidate leases into Dakota-3 E&P LLP
Sell Dakota-3 to Williams Companies
5



The owners of Dakota-3 – who made the billion dollars – are Defendants in this lawsuit
Dakota-3 E&P LLP
Individual Defendants
Spencer Wilkinson, Jr.
Rick Woodward
Robert Zinke
Och-Ziff-related "John Does"
Related Companies:
Zenergy Inc
Zenergy Properties 6 (Fort Berthold Allottee, LLC)
Dakota-3, LLC
Dakota-3 Energy, LLC
6



The windfall the Defendants made is shocking – buying leases for as low as $50 an acre and selling them for approximately $10,000 an acre
$50-500/acre
Individual Acreage
(42,000 acres)
$50/acre
Tribal Acreage
(42,500 acres)
Dakota-3 E&P LLP
Williams Companies
Dakota-3
(Subsidiary of Williams Companies)
Approximately
$10,000/acre
from Williams
(net of existing production value)
7

That disparity is the difference between $24 million initially paid by the Defendants for the acreage – and the $800 million, net of production, paid by Williams
Less than $22 Million Individual Allottees
$2.2 Million Tribal
Dakota-3 E&P LLP
Williams Companies
Dakota-3 (Subsidiary of Williams Companies)
$800 Million
(Net of existing production)
8



What explains the difference?
9



On the surface, the land appeared to have little value to unsophisticated allottees

10

## But underneath, the acreage in the Williams transaction alone held reservoirs a quarter of the size of the U.S. Strategic Petroleum Reserves



Williams estimated that these leases contain 185 million barrels of oil
Williams
"Williams estimates that Dakota-3's holdings represent approximately 185 million barrels of oil equivalent in total net reserves potential in the Middle Bakken and the Upper Three Forks formations."
– Complaint ¶ 169
12

## And this is conservative compared to other estimates of the Bakken reserves – so large that North Dakota has been referred to as the "new Saudi Arabia"

THE WALL STREET JOURNAL.

THE WEEKEND INTERVIEW | OCTOBER 1, 2011

### How North Dakota Became Saudi Arabia

*Harold Hamm, discoverer of the Bakken fields of the northern Great Plains, on America's oil future and whu OPEC's daus are numbered.*

By STEPHEN MOORE

Harold Hamm, the Oklahoma-based founder and CEO of Continental Resources, the 14th-largest oil company in America, is a man who thinks big. He came to Washington last month to spread a needed message of economic optimism: With the right set of national energy policies, the United States could be "completely energy independent by the end of the decade. We can be the Saudi Arabia of oil and natural gas in the 21st century."

"65. A more recent industry estimate by Continental Resources CEO Harold Hamm in the Wall Street Journal in 2011 stated that reserves of recoverable oil in the Bakken Formation, fully developed, is 24 billion barrels.

– Complaint ¶ 65

# Production in the Bakken Shale is unique in American history – in terms of its sheer size alone

## UPDATE 1-U.S. to become world's top oil producer in 2015 - IEA

**Tue Nov 12, 2013** 7:10pm IST

By Alex Lawler, Ron Bousso and Peg Mackey

LONDON, Nov 12 (Reuters) - The United States will stride past Saudi Arabia and Russia to become the world's top oil producer in 2015, the West's energy agency said, bringing Washington closer to energy self-sufficiency and reducing the need for OPEC supply.

But by 2020, the oilfields of Texas and North Dakota will be past their prime and the Middle East will regain its dominance - especially as a supplier to Asia, the International Energy Agency (IEA) said on Tuesday.

– http://in.reuters.com/article/2013/11/12/iea-outlook-idINL5N0IX3N320131112

The U.S. government – and sophisticated energy companies – knew the size of the Bakken reserves well before the Defendants began their scheme in 2006
Case 4:12-cv-00160-DLH-CSM Document 1 Filed 11/26/12 Page 1 of 59
IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA
RAMONA TWO SHIELDS AND MARY LOUISE DEFENDER WILSON individually, and on behalf of others similarly situated,
Plaintiffs,
v.
No.
SPENCER WILKINSON JR., RICK WOODWARD, ROBERT ZINKE, DAKOTA-3, LLC, DAKOTA-3 E&P COMPANY, LLC, (n/k/a WPX ENERGY WILLISTON, LLC), DAKOTA-3 ENERGY, LLC, ZENERGY INC., and ZENERGY PROPERTIES 6 FT. BERTHOLD ALLOTTEE, LLC, and JOHN DOE
Defendants.
Class Action Complaint
JURY TRIAL DEMANDED
"56. In 1997, the BIA's Division of Energy and Mineral Resources published an "Atlas of Oil and Gas Plays on American Indian Reservations — Northern Rocky Mountain Tribes," which included the Fort Berthold Reservation. That report stated that analysis from the U.S. Geological Survey indicated hundreds of billions of barrels of oil resided within the Bakken oil shale. To put this amount in perspective, the reserves in the Bakken Formation may be greater than all the oil reserves in the State of Texas."
– Complaint ¶ 56
15

The BIA even kept a **specific database** of geological information on the **Fort Berthold** Reservation - in the Bureau of Land Management office in Denver, Colorado
nationalatlas.gov
Where We Are
FEDERAL LANDS AND INDIAN RESERVATIONS
CANADA
WASHINGTON
OREGON
IDAHO
MONTANA
WYOMING
NEVADA
UTAH
CALIFORNIA
COLORADO
ARIZONA
NEW MEXICO
NORTH DAKOTA
SOUTH DAKOTA
NEBRASKA
KANSAS
OKLAHOMA
MINNESOTA
IOWA
MISSOURI
ARKANSAS
WISCONSIN
ILLINOIS
GEORGIA
PACIFIC OCE
NORTH DAKOTA
M
66. On information and belief, the BIA's Denver office had detailed Bakken Formation seismic data for the Fort Berthold Reservation, but did not share it with the general population at the Fort Berthold Reservation. Also on information and belief, Dakota-3 — and thus all Defendants — had access to this proprietary seismic data well prior to March 2007." – Complaint ¶ 66
U.S. Department of the Interior
U.S. Geological Survey
The National Atlas of the United States of America®
16

The public estimates of the size of Bakken Formation were escalating rapidly during the class period
2006 The Wall Street Journal ran an article on the Bakken Formation and a respected technical paper estimated up to 300 million barrels in the formation
2006 The Industrial Commission of the State of North Dakota issued a press release stating the Bakken Formation in North Dakota had 660 million barrels of probable reserves
2008 The U.S. Geological Survey upwardly revised its estimate to 4 billion barrels - and the State of North Dakota upped its estimates to 2 billion barrels in North Dakota alone
2006
2007
2008
17

The US government – and sophisticated energy companies – also knew that the fracking technology was in place and workable prior to 2006
Elm Coulee Field
Fort Berthold Reservation
North Dakota
Elm Coulee Field
Fort Berthold Reservation
"57. The first massive production of this Bakken shale oil in the area near the Fort Berthold reservation occurred in the Elm Coulee Field just over the border in Montana. That Elm Coulee production proved by 2000 that the Bakken Formation, with the help of new fracking and horizontal drilling techniques, could produce billions of barrels of oil."
– Complaint ¶ 57
18

The bottom line: experts have **known for decades** that the Bakken Formation had these massive oil reserves - and the "fracking" technology to extract it was in place by 2005
Horizontal Frac
19



Why did the U.S. government approve these
"super cheap" individual allottee leases when –

it knew both the **magnitude** of the reserves on
Fort Berthold and the **workability**
of fracking technology?



The BIA and the Leases
21

## Congress passed 25 USC § 396 to protect the "**best interest**" of the individual Indian mineral owners and gave the Secretary of the Interior the **power to enforce that standard**

"…the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect.

…

…the Secretary determines that approving the lease or agreement is in **the best interest of the Indian owners** of the Indian land."

– 25 USC § 396

## The legislative history shows that the **purpose** of § 396 is prevent exploitation and prejudice to the Indian's interest and **injustice** to them

"The legislative history of the 1909 Act supports the view that Congress was much interested in having Interior review the leasing of the Indian lands so as **to prevent exploitation of and prejudice to the Indians' interest**, **or injustice to them**. H.R.Rep No. 1225, 60th Cong., 1st Sess. at 1-2 (1908)."

– *Pawnee* 830 F.2d at 189

## The regulations in 25 CFR 212 did precisely that: requiring that the United States – through the BIA – "**maximize the best economic interests**" of the individual allottee

"The regulations are intended to ensure that the Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that **maximizes their best economic interests and minimizes any adverse environmental impacts** or cultural impacts resulting from such development."

– 25 CFR 212.1(a)

## The regulations give the BIA control of **all aspects** of the leasing process – controlling both approval and supervision

**Holds** legal title to the Native American mineral interests

**Creates** the lease form

**Finalizes** all key terms

**Approves** the price terms

**Approves** the royalty % paid

**Approves** transfer of leases to new owner

**Receives** lease money from the oil company

**Then sends lease payment to Native Americans**

– Complaint ¶¶ 25 and 68

The government even requires a standardized lease form for any allottee lease – there can be no private energy company lease form
Form 5-5432
UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
Allotment or
Roll No.
Lease No. 651A
Contract No.
7420 A 118981
OIL AND GAS MINING LEASE—ALLOTTED INDIAN LANDS
THIS LEASE, made and entered into in quintuplicate this 20th day of November, 2007, by and between the heirs of Allotment # 651A of the THREE AFFILIATED TRIBES of Indians, lessor, and ZENERGY Properties 6 Ft. Berthold Allottee, LLC, 6100 South Yale Ave., Suite 1700 of Tulsa, 74136 State of Oklahoma, lessee, WITNESSETH:
– Complaint ¶ 70
26

# That lease form expressly stated that the government was supervising all aspects of the lease

Form 5-5477

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

Allotment or Roll No.
Lease No. 651A
Contract No.

OIL AND GAS MINING LEASE—ALLOTTED INDIAN LANDS

THIS LEASE, made and entered into in quintuplicate this 20th day of November, 2007, by and between the heirs of Allotment # 651A of the THREE AFFILIATED TRIBES of Indians, lessor, and ZENERGY Properties 6 Ft. Berthold Allottee, LLC, 6100 South Yale Ave., Suite 1700 of Tulsa, 74136 State of Oklahoma, lessee, WITNESSETH:

T149N-R092W - Sec 032 Legal N2

"2. The term "**oil and gas supervisor**" as employed herein shall refer to **such officer or officers as the Secretary of the Interior may designate** to supervise oil and gas operations on Indian lands.

The term "**superintendent**" as used herein shall refer to the superintendent or other **official in charge of the Indian Agency** having jurisdiction over the lands leased."

# The lease must be formally approved and signed by a BIA official



The Bureau of Indian Affairs places a required **"rubber stamp" on the signature page** – assuring that the "**lease** is in the **best interest** of the Indian mineral owner"
This lease is in the best interest of the Indian mineral owner
Acting Superintendent
My commission expires Nov 5, 2013
STATE OF: North Dakota
COUNTY OF Mountrail
This lease is in the best interest of the Indian mineral owner
29



## Trust powers invested in a trustee can be a great benefit to someone without the expertise and experience of the trustee

The U.S. government had extensive studies of the value of the Bakken Shale in North Dakota – going back 30 years.

– Complaint ¶¶ 53-67

But a beneficiary of this government trust power is truly betrayed and swindled –

if the government starts yielding to outside economic interests seeking to obtain unfairly low oil and gas leasing prices



Corruption of such government trustee power often involves two parties
Outside interest influencing the person with the trust power
Corrupting Influence
Trust official being influenced
32

# Was the government merely incompetent or were they improperly influenced?

# Defendants' systematic scheme to improperly influence the BIA

It took a sophisticated, well-planned scheme by the Defendants to obtain "super cheap" leases, consolidate them – and then realize windfall prices – despite the government's involvement
2004 - Early 2006
Wilkinson and Woodward pull together plan to buy leases including obtaining financing
2006-2008
Zenergy begins buying leases
2007
Wilkinson and Woodward convince the tribal council to sell tribal acreage for $50 an acre - without any auction
2008
Wilkinson gets BIA to approve assignment of the individual and tribal leases to the Dakota-3 middleman entity
2010
Williams Companies buys Dakota-3 E&P LLC - which now holds all 84,500 acres
2004
2005
2006
2007
2008
2009
2010
35

The best evidence that an efficient market was not working here is shown by the gross disparity between the initial lease prices – and the price Williams paid for those leases
Less than $22 Million Individual Allottees
$2.2 Million Tribal
Dakota-3 E&P LLP
Williams Companies
Dakota-3 (Subsidiary of Williams Companies)
$800 Million
(Net of existing production)
36



# Spencer Wilkinson admits in March 2008 tribal meeting minutes that he paid only $2.1 million for the tribal leases

**Three Affiliated Tribes – Sunday March 9, 2008**

**Inner Voice – Tribal Members/Grass Roots Organization**

**Meeting Chair (s): Verdall Smith / Carroll Howling Wolf**

<u>New Town Civic Center, New Town, ND</u>

2:00 pm Meeting Called to Order with an Opening Prayer by Elder Dwayne Fox

Meeting Chair obliges Spencer Wilkinson request - to speak as first speaker.

I Spencer Wilkinson Jr. - Speaking when we entered Center @ about 2:00 pm

Speaking about the lawsuit against his company, Dakota 3 – claiming he has never met RLN, does not know who these people are. Says he is trying to defend himself and he will be countering this lawsuit. Interaction with audience – they were telling him he's not a lawyer – he wanted to read his lawyers legal opinion back. [Bobbie Larson – do not want to hear from you].

[Bonnie Red Fox – explain, "his job was to keep the Council happy", ... obvious].

SW: That part was the worst part of the whole thing, it cut like a knife into my heart.

These guys are trying to jump onto my company. I will be responding. You've only heard one side.

[Bernadine Wilson – you're in business & this is all about you, you're the only one who stands to make money. (no response)]

SW: Frank White Calf is not a partner in Dakota 3

We paid $2.1 Million – 3 weeks ago for leases – my partners are Zenergy, Och Ziff, Schlumberger.

I did not resell the leases. This lawsuit is frivolous.

I am pleading with you to tell you these things are not true. [People from audience, they do not want to hear from him, Verdal Smith trying to take back microphone and Spencer will not give it back.]

[John Danks – How this all came about, and how someone was so special to be selected for such a lucrative agreement. How one member was selected. Why is the BIA allowing this? You've just got caught in your tracks. The BIA signed a mineral agreement knowing that it was not fair market value. Why is the tribe negotiating "sweetheart deals"? We need a separation of powers and a new government.

Meeting Chair introduced next speaker – Bud Mason

II Bud Mason – This is a train wreck trying to happen. [To Spencer], Spence, I told you, watch what you're doing, you're going to get sued. You are dealing with Trust Property. You are a Manager of a Casino and you have crossed over. This is a Federal Case and you guys are going to have to prove your innocence. Everyone of us are owners. Showed Reservation Map and showed all of the acres that were

1

"Spencer Wilkinson, Jr.:

'**We paid $2.1 Million** – 3 weeks ago for leases…

I did not resell the leases…'"

– Exhibit G of Plaintiff's Response to Motion to Dismiss



Also in 2008, leases immediately adjoining the Fort Berthold Reservation were going for $2,000 or higher per acre
Adjacent Leases
Fort Berthold Reservation
Elm Coulee Field
Montana
North Dakota
– Complaint ¶ 131
38

A **non-Indian landowner** with property on the Reservation negotiated a lease with **20% royalty rate** – at the same the time the class members were getting 18%

"160. The difference between an 18 percent royalty rate [given to the Two Shields class] —and the 20 percent royalty rate received by an Anglo mineral interest owner with property on the Fort Berthold Reservation—is estimated to be in excess of $100 million for the 42,000 mineral interest acres of allottee leases in dispute in this lawsuit."

– Complaint ¶160

**That royalty rate difference alone is worth in excess of $100 million for the 42,000 mineral interest acres**

## The political influence of Wilkinson and Woodward on the BIA cannot be underestimated

Spencer Wilkinson, Jr., casino manager:

- used **cash favors** from the Fort Berthold Reservation **casino** to achieve the Dakota-3 scheme (Complaint ¶ 37)
- orchestrated the **election** of Tribal **Chairman Marcus Wells**, who had **great influence** on the BIA (Complaint ¶ 118)

## Wilkinson at one point even had his private Dakota-3 offices inside the tribal administration building

"119. Wilkinson used his connection to Wells to set up a Dakota-3 office in the tribal headquarters and used this as Dakota-3's mailing address for a period of time."

- Complaint ¶ 119

# There is clear linkage to the BIA's failure to do its job

## High Country News

"In an interview reported in April 2012 in the High Country News, Mr. Hunt (BIA's Petroleum Engineer) **could not recall** whether the BIA had ever advised any allottee to **reject low offers, and refused to answer whether the BIA had approved deals too readily**. Instead, he insisted,

'**This was the driving force behind it: We had companies in the office. We had councilmen and mineral owners in the office – hundreds each day – and everyone saying, 'We want our money now. We want our leases now.' I think if we had said, 'Let's wait a while,' people would have strung us up**.'"

– Complant ¶ 127

During the 2006-2008 period, the Bureau of Indian Affairs had a revolving door at Fort Berthold of at least half a dozen different interim superintendents



– Complaint ¶ 121

43

## Mr. Bemer – the BIA Superintendent put in office through the influence of Marcus Wells – and his predecessor even limited auctions under pressure from one or more of the Defendants

"122. By the latter half of 2007, a man named Howard Bemer had become interim superintendent at the Fort Berthold Reservation. Upon information and belief, Bemer had little (if any) experience with oil and gas leasing, and **Wells proposed and/or supported the BIA's decision to make Bemer the permanent superintendent** at the Fort Berthold Reservation. The BIA did so in or around October 2007.

123. With a half-dozen interim supervisors being transferred during the year prior to his arrival, **Bemer knew his position of authority was tenuous** at best. For instance, a predecessor BIA interim superintendent was pressed by a local landowners association group to have an "auction bid" process to establish a better value. **He briefly opened up bidding and got a $600 an acre bid from EOG Resources out of Houston, Texas. Yet the BIA closed down the open-auction bidding**."

– Complaint ¶¶ 122 and 123.

The Fort Berthold Elders Organization sent a letter to the BIA in March 2008 – protesting any attempt by Dakota-3 to flip the leases



March 26, 2008

Honorable Ross Swimmer
Office of Services and Trust for American Indians
1849 8 St. N.W.
Washington, D.C. 20240
MS 5140

DISTRIBUTION LIST:

Superintendent, Fort Berthold Bureau of Indian Affairs
AAO – Bureau of Indian Affairs
Senate Committee on Indian Affairs
ND Congressional Delegates

45

## The Complaint sets forth specific allegations on the protest against flipping – to which the BIA failed to respond

"148. This article and the counterclaim were specifically brought to the attention of the United States by letter dated March 12, 2008, to the Attorney General at The Department of Justice from the Mandan, Hidatsa & Arikara Elders Organization (the "Elders Organization). Attachments included the New Town News article, the draft counterclaim, and the December 21, 2007, letter referenced above.

149. On March 26, 2008, the Elders Organization sent letters to The Office of Services and Trust for American Indians and again to the Attorney General at The Department of Justice. The letters discussed the outrage expressed at a March 9, 2008, meeting open to all residents on the Fort Berthold Reservation. **The letters expressed fear that "Dakota-3 may flip" its IMDA**. The letter also noted that at the meeting, it was "echoed that there is a conspiracy here, the BIA is allowing these lucrative agreements between oil companies and the BIA signed mineral agreements knowing that it was not fair market value." The letter further noted that the BIA and other agencies "have failed in their fiduciary responsibilities to the enrolled members of this Tribe."

– Complaint ¶¶ 148 and 194

Instead, the Elders Organization's funding was cut off by the tribal council for protesting the Dakota-3 flipping scheme
Case 4:12-cv-00160-DLH-CSM Document 1 Filed 11/26/12 Page 1 of 59
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
RAMONA TWO SHIELDS AND MARY LOUISE DEFENDER WILSON individually, and on behalf of others similarly situated,
Plaintiffs,
v.
No. ______________
SPENCER WILKINSON JR., RICK WOODWARD, ROBERT ZINKE, DAKOTA-3, LLC, DAKOTA-3 E&P COMPANY, LLC, (n/k/a WPX ENERGY WILLISTON, LLC), DAKOTA-3 ENERGY, LLC, ZENERGY INC., and ZENERGY PROPERTIES 6 FT. BERTHOLD ALLOTTEE, LLC, and JOHN DOE
Defendants.
Class Action Complaint
JURY TRIAL DEMANDED
"152. The Elders Organization was punished with a cut-off of funding from the tribe."
– Complaint ¶ 152
47

In early 2008 the BIA placed a $1000 lease **at the bottom of the pile** for processing - while first continuing to process a stack of cheap, below-market Fort Berthold leases

$100

$1000

"124. On information and belief, at one point in this time period, the BIA was presented with a $1,000 an acre lease, which the BIA stuck at the bottom of the pile and ignored in favor of continuing to rubber-stamp other below-market leases."

– Complaint ¶ 124

## Zinke and Zenergy had clearly been involved since the beginning of the scheme – as Wilkinson admitted in a December 2007 threatening letter to Peak Energy – one of Zenergy's leasing competitors

Dec 06 2007 8:06PM HP LASERJET FAX p.2

DAKOTA 3 L.L.C.

December 5, 2007

**December 5, 2007**

I have been associated with Zenergy and its partners for many months now to assist them in the acquisition of lease commitments from allottees on the Ft. Berthold Reservation and in the efforts of Zenergy Properties 6 Ft. Berthold Allottee, LLC to participate in the Oil and Gas Lease Sale which took place on November 15, 2007 under the direction of the Bureau of Indian Affairs.

Are you soliciting allottees to withdraw their lease commitments which have been made to Zenergy? Surely that can't be true. Surely you would not interfere with relationships that we have worked so hard to develop. We have worked tirelessly over the last several months to obtain lease commitments from allottees, and as a result of those efforts we have developed contractual agreements that bind both parties. Any interference by you will cause me damage and I will take action.

JN 0000003

– Complaint ¶ 162

# Wilkinson's threats were copied to key BIA officials Bemer and Black, tribal chairman Marcus Wells, other tribal council members and defendant Robert Zinke

Please provide me with the name of someone at your company who can truthfully tell me that you are not interfering with my rights. You may reach me at 701-421-1590.

Sincerely,

Spencer Wilkinson, Jr.
President / Dakota 3 L.L.C.

cc: Howard Bemer, Superintendent / Ft. Berthold Agency
Michael Black, Regional Director, Aberdeen
Marcus Wells Jr., Chairman / Three Affiliated Tribes
Nathan Hale, Vice Chairman
Frank WhiteCalfe, Treasurer
Judy Brugh, Secretary
Barry Benson, Council Member
Mervin Packineau, Council Member
Malcolm Wolf, Council Member
Robert M. Zinke, President of Zenergy



Spencer Wilkinson, Jr. again in March 2008 publicly announced that Zenergy was part of Dakota-3's "world class partnership"

Case 4:12-cv-00160-DLH-CSM Document 64-7 Filed 04/22/13 Page 2 of 11

ANNOUNCEMENT AND RESPONSE FROM DAKOTA 3 L.L.C. AND SPENCER WILKINSON JR.

To the residents and enrolled members of the Fort Berthold Reservation, I Spencer Wilkinson Jr. President of Dakota 3 L.L.C. will respectfully respond to the recent article published in the New Town News on March 6, 2008 and will also furnish factual information that will counter the claims that are being made against myself, Dakota 3 and others.

Let me start by saying that Dakota 3 and I unequivocally and categorically deny any improper conduct with respect to Ervin Lee and his co-claimants (RLN Mineral Group). I have retained a credible legal firm to defend myself and Dakota 3 against the misstated facts published in the New Town News. In the dozens of pages of documents the RLN Mineral Group utilizes to support their alleged claims they fail to produce any written agreements, drafts of agreements, or even letters referencing an agreement, nor do they produce any evidence that one single dollar of their money was paid directly to Dakota 3 or Spencer Wilkinson Jr. Dakota 3 and I intend to defend the allegations against us vigorously, and to pursue fully any remedies available against any individuals or organization(s) that repeat, reprint, or otherwise publish any untruthful statements regarding this matter.

Dakota 3 L.L.C. has assembled a world class partnership to develop oil and gas on the Fort Berthold Reservation. The team includes Zenergy which has extensive drilling experience in North Dakota; Schlumberger, the world's leading oilfield service company; and Och-Ziff, a multi-billion dollar investment company. This type of alliance enhances the opportunity for success in the development of oil and gas to both the Tribal and Allottee acreage. As an enrolled member, I am very excited to be able to bring this level of service to the Tribe and the Allottees. Dakota 3's intent is to make the landowners on the reservation as financially secure as those landowners off the reservation through development of oil and gas. A person can look into the horizon and see rigs off and on the reservation. The Tribe and its members deserve the same opportunity that is being afforded to these individuals and Dakota 3 has partnered with very experienced oil and gas companies to make this a reality and is well prepared to develop oil and gas in a very capable and attentive manner.

Dakota 3 L.L.C. states with an accurate and truthful manner that there is 1) No Tribal Council Member is a member/owner in Dakota 3 L.L.C. Company, 2) Dakota 3 did not resell tribal acreage for a profit and 3) Dakota 3 L.L.C.'s I.M.D.A. potentially offers the best econbmic package to the Tribe and has been approved by the Bureau of Indian Affairs. Free Enterprise is an opportunity that exists for all individuals on and off the reservation. It exists in the form of ranching, retail and other pursuits. I am very proud to be given the opportunity to compete and work with other oil companies committed to develop oil and gas on the reservation. I want to sincerely thank all of the Elders, Council members, Casino Board members and employees, friends and family members who have helped me get to this opportunity. I know that I wouldn't be here without you. I will exert every effort not to fail at this endeavor, just as I do at the casino. We just had our first enrolled member be named Ms. Basketball of North Dakota, I am very proud of her and I hope that I can be as successful as she has been at obtaining her goals.

Thank you for your time and support and God Bless.

Spencer Wilkinson Jr.

ANNOUNCEMENT AND RESPONSE FROM DAKOTA 3 L.L.C. AND SPENCER WILKINSON JR.

"Dakota 3 LLC has assembled a world class partnership to develop oil and gas on the Fort Berthold. The team includes Zenergy which has extensive drilling experience in North Dakota…"

– Complaint ¶ 147

51





The legal standards applicable
52

Common law recognizes a spectrum of causes of action against those that corrupt trustee power
Little involvement
with the breaching trustee
Heavy involvement
with the breaching trustee
Knowingly benefitting from breach of duty
Aiding and abetting breach of duty
Tortious Inducement
Conspiracy with trustee to injure beneficiary
53

## **The Restatement of Torts** has long included "aiding and abetting" as a common law cause of action – which has been recognized by the **North Dakota Supreme Court**

Restatement of Torts 876(b) was recognized in ***Hurt v. Freeland*, 589 N.W.2d 551, 557 (N.D. 1999)**, where the dispute was over whether a passenger "aided or encouraged" a drunk driver.

## The Restatement of Torts further includes "**tortious inducement**" as a common law cause of action – which has also been recognized by the **North Dakota Supreme Court**

Restatement of Torts 877 was applied in ***Zimprich v. N.S. Harvestore Sys., Inc.*, 419 NW. 2d 912, 914 (N.D. 1988)** in which the court concluded that jury could find that a **creditor tortiously induced a third-party to wrongfully repossess** farm equipment from the plaintiff when it lead the third party to believe that the plaintiff "was in default on the installment contract".

## The **North Dakota Supreme Court** in 1999 held that you can have joint tortfeasors that are jointly and severally liable for acting in concert to commit a tortious act

In ***Kavadas v. Lorenzen*, 448 N.W. 2d 219, 221 (N.D. 1989)**, the North Dakota Supreme Court held that "two or more tortfeasors who act in concert in committing a tortious act **or aid or encourage the act**" are **jointly and severally liable** to the injured plaintiff."

## The common law "aiding and abetting" remedy has **great flexibility** for an injured plaintiff

- There is **no requirement to sue the underlying tortfeasor** – who may have disappeared or may have just been a stooge.
- There is also **no requirement to sue all the aiders and abetters**.
- This is the efficient way to litigate against the one that walked away with the big money.
- Indeed, the North Dakota Supreme Court in that same *Kavadas* case clearly stated that "**the plaintiff can sue one or more as he chooses**".

## The flexibility of the aiding and abetting rule also applies to two others issues raised by the defendants

- **The "indispensability" argument** – an "aiding and abetting" claim never requires suing all parties.
- **The "preemption" argument** – there is no reason why the U.S. government would want to preempt a common-law right of action that prosecutes parties that corrupt government officials.

## Finally, "aiding and abetting" can result from **either** "encouraging" **or** "substantial assistance" – both are not required

In **Kavadas v. Lorenzen, 448 N.W. 2d 219, 221 (N.D. 1989)**, the North Dakota Supreme Court held that "two or more tortfeasors who act in concert in committing a tortious act or **aid or encourage the act**" are jointly and severally liable to the injured plaintiff."

"[A] claim for aiding and abetting another's wrongful act can be maintained if a person 'knows that the other's conduct constitutes a breach of duty and gives **substantial assistance or encouragement** to the other so to conduct himself.'" *PFS Distribution Co. v. Raduechel*, 574 F3d 580, 595 (8th Circ. 2009).



The *Twombly* Issue:
Have the Plaintiffs pled sufficient factual allegations to sustain a cause of action for aiding and abetting?
60

## Under *Twombly*, all that is required is a short statement of the factual allegations

- To quote *Twombly* at 550 U.S. 554, 570 – "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face."
  - **Plausible** means "**believable**" – or **within the range of possibility**.
- *Twombly* makes clear that this is a "**context-specific** task that requires the reviewing court to draw on its judicial experience – and **common sense**." (Id. At 679).

# The 14-page Exhibit A to the Plaintiffs' Consolidated Response Brief lists in detail the evidence – far more than is required to meet the *Twombly* standard

## Key Complaint Allegations – Organized by Cause of Action

**Defendant Wilkinson – Aiding & Abetting/Tortious Inducement**

| Claim Elements | Reasonable Inferences and Allegations |
|---|---|
| **(1) underlying fiduciary breach;** | The BIA breached its obligation to negotiate for the Plaintiffs and approve only those leases that were in their "best interest."<br><br>**The BIA failed to negotiate leases on Plaintiffs' behalf.**<br><br>¶¶ 153-55: The BIA admitted in July 2008 that it had not yet begun "assisting mineral owners in negotiations upon request [or], preparing advertisements for competitive sales."<br><br>¶¶ 156-59, 172-78: The BIA never attempted to negotiate a higher royalty rate for Plaintiffs, never insisted on an escalation clause, never limited well spacing, and did not include any environmental or cultural protections in their leases.<br><br>**The BIA failed to establish fair market value for Plaintiffs' mineral interests.**<br><br>¶¶ 63-67, 141-43: By March 2007, the BIA knew about the amount of oil in play, but never made any attempt to value allottees' interests. Even after tribal members "pleaded . . . for help," it did nothing.<br><br>¶¶ 81, 157-58, 170-71: The BIA's failure is highlighted by the fact that it approved leases for "few hundred dollar bonus payments" while the Williams Company paid nearly $10,000 per acre.<br><br>¶¶ 122, 125, 157-58: BIA Superintendent Earl Silk admits that he had been "somewhat concerned" about "some of the dollar amounts" being approved but lacked the staff to correct the issue.<br><br>¶¶ 127-28: The BIA admits it bowed to pressure from "councilmen and mineral owners" to approve leases without proper evaluation because "if we had said, 'Let's wait a while,' people would have strung us up."<br><br>¶¶ 151, 153-55: The BIA admits it never "establish[ed] fair market value" for leases. |

2665665v1/012782

There is no preemption
63

## The Supreme Court in *Poafpybitty v. Skelly* held that **25 U.S.C. § 396** – the statute at issue in this case – **did not preempt** allottees from bringing a common law claim

"While the United States has exercised its supervisory authority over oil and gas leases in considerable detail, we find nothing in this regulatory scheme which would preclude petitioners from seeking judicial relief for an alleged violation of the lease."

– 390 U.S. 365, 373 (1968)

**No Preemption**

# Defendants' preemption cases do not apply

- *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980)
- *Ramah Navajo School Bd. v. New Mexico*, 458 U.S. 832 (1982)
- *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983)
- *Montana v. Blackfeet*, 471 U.S. 759 (1985)
- *Gaming Corp. v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996)
- *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes*, 261 F.3d 567 (5th Cir. 2001)
- *Gaming World Int'l Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840 (8th Cir. 2003)
- *Everglades Ecolodge v. Seminole Tribe*, 836 F. Supp.2d 1296 (S.D. Fla. 2011)

INDIAN TRIBES

- **These cases don't implicate 25 U.S.C. § 396**
- **Preemption inquiry in these cases focuses on tribal sovereignty issues**
- **No tribal sovereignty issues raised in our case**
- **No concern about the US having "its decisions questioned by the tribunal of another sovereign"**



Plaintiffs' claims will not interfere with the purpose of 25 U.S.C. § 396
The statute was created to protect allottees from exploitation – including from third parties like Defendants
Plaintiffs' claims will further the purpose of the statute
66

# § 396 and its regulations provide a specific rights-creating duty

"The legislative history of the 1909 Act supports the view that Congress was much interested in having Interior review the leasing of the Indian lands so as **to prevent exploitation of and prejudice to the Indians' interest**, **or injustice to them**. H.R.Rep No. 1225, 60th Cong., 1st Sess. at 1-2 (1908)."

– *Pawnee* 830 F.2d at 189



The U.S. owes a fiduciary duty
to Plaintiffs under 25 U.S.C. § 396
68

## The Federal Circuit in *Pawnee* held that § 396 – the statute at issue here – imposes a fiduciary duty on the United States

*Pawnee* involved allottees suing the U.S. under § 396

- "**This statute places the Secretary of the Interior at the center of the leasing of Indian mineral lands**. He determines whether to consent to a lease and the terms of the leases; he performs 'any and all acts' necessary to carry out the statute 'into full force and effect'; and he makes such rules and regulations as may be necessary to carry out the legislation."

– 830 F.2d at 189

## The Federal Circuit in *Pawnee* held that § 396 – the statute at issue here – imposes a fiduciary duty on the United States

*Pawnee* involved allottees suing the U.S. under § 396

- "Because **the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government** in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained."

– 830 F.2d at 190



*Pawnee* is consistent with Supreme Court Precedent

*Pawnee*: "This case is very much like *United States v. Mitchell*, 463 U.S. 206, 103 S. Ct. 2961, 77 L. Ed.2d 580 (1983)." [*Mitchell II*]

– 830 F.2d at 190

71

# *Pawnee* is consistent with Supreme Court Precedent

*Mitchell II* established a two-part test:

1. Identify a right in a source of substantive federal law

2. Demonstrate that the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for damages sustained

# *Pawnee* is consistent with Supreme Court Precedent

- *United States v. White Mtn. Apache Tribe*, 537 U.S. 123 (2003)
- *United States v. Navajo Nation*, 537 U.S. 488 (2003) [*Navajo I*]
- *United States v. Navajo Nation*, 129 S. Ct. 1547 (2009) [*Navajo II*]

**All three cases rely on *Mitchell II* Analysis**

# § 396 and its regulations provide a specific rights-creating duty

- BIA controls the lease process
- BIA approves leases when **"best interest"** standard is met (25 USC §396; 25 CFR §§ 212.3, 212.4, 212.20)
- BIA is tasked "to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a matter that **maximizes their best economic interests** and minimizes any adverse environmental or cultural impacts resulting from such development." (25 CFR § 212.1)

# § 396 and its regulations provide a specific rights-creating duty

"**The language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship**. For example, 8 of the 1910 Act, as amended, expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of "the needs and **best interests of the Indian owner** and his heirs" and that proceeds from such sales be paid to owners 'or disposed of for their benefit.' 25 U.S.C. 406(a). Similarly, even in its earliest regulations, the Government recognized its duties in 'managing the Indian forests **so as to obtain the greatest revenue** for the Indians consistent with a proper protection and improvement of the forests.'"

– *Mitchell II*, 463 U.S. at 224

§ 396 and its regulations provide a specific rights-creating duty
The *Pawnee* court cited *Skelly* and said:
"...that 'the United States has exercised its **supervisory authority** over oil and gas leases in **considerable detail**' (390 U.S. at 373, 88 S.Ct. at 986)."
– 830 F.2d at 190, n. 4
76

§ 396 and its regulations provide a specific rights-creating duty
"The total of these regulations is comprehensive, giving wide powers to Interior as to all aspects of the leasing arrangement"
– Pawnee, 830 F.2d at 190
77

*Pawnee* remains good law

## § 396 ≠ § 396a

- Defendants' misplaced reliance on *Shoshone Indian Tribe v. United States*, 672 F.3d 1021 (Fed. Cir. 2012)
  - Tribal case
  - § 396a applied – § 396 did not
  - *Pawnee* not implicated and did not apply

# The dispute is clearly ripe

This case is ripe for review
• 25 C.F.R. § 2.6(a) applies only to APA claims and this is not a an APA case
• The U.S. Supreme Court in Horne held that administrative ripeness is not jurisdictional anyway
80

## This Court itself has held that 25 C.F.R. § 2.6(a) – which Defendants raise – applies only in the APA context

"BIA regulations which appear at 25 C.F.R. § 2.6(a) and 43 C.F.R. § 4.314(a) set forth what will amount to a 'final agency action' **for purposes of APA review**."

- *Fort Berthold Land & Livestock Ass'n. v. Anderson*, 361 F. Supp. 2d 1045, 1051 (D.N.D. 2005) (Hovland, J.) (emphasis added).

**This is not an APA case**

# The regulation itself makes this clear

2.6(a): "No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final so as to constitute Departmental action **subject to judicial review under 5 U.S.C. 704**, unless when an appeal is filed, the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately."

## Regardless, administrative ripeness is not jurisdictional – as the U.S. Supreme Court has just confirmed in 2013

"A 'Case' or 'Controversy' exists once the government has taken private property without paying for it. **Accordingly, whether an alternative remedy exists does not affect the jurisdiction of the federal court**."

"Although we often refer to this consideration as 'prudential "ripeness,"' we have recognized that **it is not, strictly speaking, jurisdictional**."

- *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062 & n.6 (2013) (citations omitted) (emphasis added).

# Defendants also miss the point on exhaustion of remedies

- Exhaustion is **not required** when litigant **seeks only money damages** and **agency lacks authority** to award such relief.
  - *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992).
- Exhaustion is **not required when a party does not learn it has been wronged** until after the administrative deadline has passed.
  - *Bowen v. City of New York*, 476 U.S. 467 (1986).

## The *McCarthy* rule: Prudential exhaustion is excused here because the BIA cannot award damages

"[W]hen a litigant has **deliberately** forgone any claim for injunctive relief and has singled out discrete past wrongs, specifically requesting monetary compensation only, . . . **the absence of any monetary remedy in the grievance procedure also weighs heavily against imposing an exhaustion requirement**."

- *McCarthy v. Madigan*, 503 U.S. 140, 154 (1992) (emphasis added).

## The *Bowen* rule: Exhaustion is excused here because Plaintiffs learned of the Government's breach only after the deadline

"At the outset, we note that by the time this lawsuit was filed, it was too late for a large number of class members to exhaust their claims . . . . **Since "[m]embers of the class could not attack a policy they could not be aware existed," it would be unfair to penalize these claimants for not exhausting under these circumstances.**"

- *Bowen v. City of New York*, 476 U.S. 467, 482 (1986) (internal citations omitted) (emphasis added).

# Defendants do not – and cannot – show that Plaintiffs learned of the Government's breach before the administrative deadline

- They knew that other companies [illegible] tribal leases [illegible]06. Compl. ¶ 137.
- In 2006, a Tribal employee warned [illegible]al Bus[illegible]ouncil that companies would attempt to acquire leases for less than fair mark[illegible] *Id.*
- In July 2007, the Tribal Business Coun[illegible]ing which discussed a report by the North Dakota Industrial that indicated 319 mill[illegible] of recoverable oil were possible on the Fort Berthold Reservation. *Id.* ¶ 63.
- In December 2007, a member of the Tr[illegible] a $35 acre bonus bid and noted higher bonuses in the area. *Id.* ¶ 144.
- "Fort Berthold Reservation elders [illegible]ers" pub[illegible]jected to the bonus payments on earlier tribal leases. *Id.* ¶ 82 (discussin[illegible]es" related [illegible] of the tribal lease).
- When Plaintiffs leased their lands, they knew other leases had been executed on and near the Fort Berthold Reservation with higher bonus bids. *Id.* ¶ 131-34, 137
- They [illegible]
- Court filings of value projections "between $452 million and $1.3 billion" were published and "distribute[illegible]
- Events confirmed that a tribal lease at $40 an acre was allegedly "not for fair market value" "before its final approval in January 2008." *Id.* ¶ 136.

**No one had an inkling until the Williams transaction**

# The law clearly states that the U.S. Government is not an indispensable party

# It is a well-established rule that a joint tortfeasor – like the U.S. in this case – does not need to be joined

## The Supreme Court says so

- "Temple contends that it was error to label joint tortfeasors as indispensable parties under Rule 19(b) and to dismiss the lawsuit with prejudice for failure to join those parties. We agree."
- "**It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.**"
  - *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990) (per curiam) (emphasis added).

## It is a well-established rule that a joint tortfeasor – like the U.S. in this case – does not need to be joined

### The Rule itself says so

The "definition of persons to be joined . . . is not at variance with the settled authorities holding that **a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability**. Joinder of these tortfeasors continues to be regulated by Rule 20; compare Rule 14 on third-party practice."

- Advisory Committee Notes to Rule 19

## There is no Rule 19 issue because Plaintiffs seek only money damages – not specific relief

"The plaintiff seeks only monetary damages from the Company for his alleged wrongful discharge, and of course this relief can be granted without the presence of the Union."

- *Sandobal v. Armour & Co.*, 429 F.2d 249, 257 (8th Cir. 1970).

## The United States is not required here because Plaintiffs do not ask this Court to set aside their leases

"[T]here is no justification for concluding that the severe sanction of cancellation of the lease is the only relief for all breaches of the lease terms or for any failure to pay royalties. Both the lessor and the lessee may wish to resolve their disagreement **by the payment of damages** . . . ."

– *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 374 (1968) (emphasis added).

## It is black letter law that the U.S. is not an indispensable party in individual allottee cases

"In substantial part because of what the Supreme Court decided in case[s] like '*Poafpybitty*,' the prevailing view in the Eighth Circuit and elsewhere is that **the United States is not an indispensable party** in cases where either Indian tribes or individual allottees are suing for trespass or for declaratory relief to protect their beneficial interests in trust lands from being diminished by third parties."

- *Houle v. Cent. Power Elec. Co-op., Inc.*, No. 4:09-CV-021, 2011 WL 1464918, at *25 (D.N.D. Mar. 24, 2011) (emphasis added).

## It is settled law that a party is not required just because its conduct is at issue

"[T]his possibility exists in almost any case in which Indian tribes or individual allottees are allowed to sue to protect their beneficial interests from encroachment by third parties, and as the prevailing case law cited above has made clear, **this is not enough to make the United States an indispensable party**."

- *Houle v. Cent. Power Elec. Co-op., Inc.*, No. 4:09-CV-021, 2011 WL 1464918, at *27 (D.N.D. Mar. 24, 2011) (emphasis added).

# The United States has no "legally protected" interest in this case at direct risk of impairment

"This interest must be 'legally protected, not merely a financial interest or interest of convenience.'"

- *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, 968 F. Supp. 1422, 1430 (D. Kan. 1997) (quoting 4 James W. Moore, Federal Practice § 19.03[3][b] (3d ed. 1997)).

## This Court has already held that the United States is not required simply because its conduct is at issue

"[T]his possibility exists in almost any case in which Indian tribes or individual allottees are allowed to sue to protect their beneficial interests from encroachment by third parties, and **as the prevailing case law cited above has made clear, this is not enough to make the United States an indispensable party**.

- *Houle v. Cent. Power Elec. Co-op., Inc.*, No. 4:09-CV-021, 2011 WL 1464918, at *27 (D.N.D. Mar. 24, 2011) (emphasis added) (citing *Skelly*, 390 U.S. at 373-74).

Neither Defendants nor the Government are at risk of inconsistent obligations here because Plaintiffs only ask for money damages
Money Claim ≠ Lease Cancellation
– Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 374 (1968).
≠
LEASE AGREEMENT
103

# Defendants misstate the holding of *Laker Airways*

Defendants state that the Eleventh Circuit held in *Laker Airways* that "a joint tortfeasor in a money damages case was a required party because—unlike a 'routine' joint tortfeasor—the court's decision would require an adjudication of the absent party's conduct."

- Defendants' Reply in Support of Motion to Dismiss at Page 2.

**Not True**

## The absent party was required in *Laker Airways* because an adverse decision would have automatically caused it to lose its official position – a very real practical impairment

"In order to prove its antitrust claims, Laker would be required to show that ACL acted in other 'than an independent manner.' Such a ruling would surely implicate the interests of ACL **because the United Kingdom's enabling legislation, ASAR, requires that the Secretary of State for Transport withdraw its approval of an appointed coordinator if its behavior is not neutral**."

- *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (emphasis added).

## The U.S. was required in *Nichols* because the relief plaintiffs requested would have required it to be reinstated as trustee over the land at issue – a very real practical impairment

"[I]f appellants prevailed in this suit, the United States would be reinstated as trustee over the land, with the concomitant resumption of fiduciary responsibility . . . ."

- *Nichols v. Rysavy*, 809 F.2d 1317, 1333 (8th Cir. 1987).

## The U.S. was required in *Paiute-Shoshone* for the same reason – the plaintiff's claim would have required it to either give land to the plaintiff or be reinstated as trustee

"To achieve the relief that it seeks, Plaintiff would require an additional order, apart from an order ejecting the City, requiring the United States either to cede title to Plaintiff or to hold the land in trust for Plaintiff's benefit."

- *Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 998 (9th Cir. 2011).

## Plaintiffs have a heavy interest in having a forum to bring their claims against Defendants – and this is the only forum that exists

The question is whether "the plaintiff, if dismissed, could sue effectively in another forum **where better joinder would be possible**."

- *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109 n.3 (1968) (emphasis added).

## The Eighth Circuit has rejected Defendants' argument that Plaintiffs must drop claims in order to get a forum

"Finally, if this action were dismissed, **it is almost a certainty that Rochester would not have an adequate remedy**. It cannot sue Travelers in the Claims Court. It could sue [the Government], but not on the fraud theory on which it has prevailed here, because sovereign immunity has not been waived with respect to claims of misrepresentation."

- *Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir. 1984) (emphasis added).

## Defendants are not at risk of "multiple litigation, or inconsistent relief, or sole responsibility for a liability" they share with another

"*Poafpybitty* makes clear that the policies advanced by allowing tribes and allottees to be able to sue to protect their interests trumps any concern over the possibility of multiple suits."

- *Houle v. Cent. Power Elec. Co-op., Inc.*, No. 4:09-CV-021, 2011 WL 1464918, at *27 (D.N.D. Mar. 24, 2011) (emphasis added).

## This Court can grant complete relief here because, again, all Plaintiffs seek is money and Defendants are joint and severally liable with the United States

Joinder is required "only when the absence of the unjoined party prevents complete relief **among the current parties**."

- *LLC Corp. v. Pension Ben. Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983) (emphasis added).

## Even though none of Defendants' or the Government's complaints are valid, simple coordination would cure each anyway

Defendants complain about discovery

- **Coordination gets them discovery**

Defendants complain about having to defend United States

- **Coordination eliminates that need**

United States complains about wanting to defend its actions

- **Coordination gives them that opportunity**

"Equity and good conscious" do not require dismissal here
Dismissal
• Plaintiffs' interest in a forum.
• Defendants' interest
• Government's interest
• Interest of "the courts and the public"
• Ability to cure any prejudice through COORDINATION
109